**SO ORDERED.**

**SIGNED this 24th day of July, 2023.**



_____
Mitchell L. Herren
United States Bankruptcy Judge

_____

**DESIGNATED FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE:

**WICHITA HOOPS, LLC**

                **Debtor.**

**Case No. 23-10255**
**Chapter 11**

---

**ORDER DENYING WEBB INDUSTRIAL, LLC's MOTION FOR RELIEF
FROM THE AUTOMATIC STAY UNDER 11 U.S.C. § 362(d)(1) OR,
ALTERNATIVELY FOR A DETERMINATION THAT NO AUTOMATIC STAY
IS IN PLACE UNDER § 362(b)(10) [Doc. 48]**

Webb Industrial, LLC ("Webb") is the landlord of a commercial lease with

debtor/tenant Wichita Hoops, LLC ("Hoops"). Webb moves for relief from the

automatic stay for cause under § 362(d)(1) to proceed with its prepetition Kansas

state court forcible detainer lawsuit against Hoops, or alternatively, for a

determination that the automatic stay does not apply to the lease under § 362(b)(10)

1

(the "Motion").[1] Hoops objects to the Motion.[2] The Court held an evidentiary

hearing over two days and issued a preliminary oral ruling at the close of evidence.[3]

This written Order memorializes the Court's oral ruling and contains its findings of

fact and conclusions of law.

I.    <u>Factual Background</u>

Hoops operates a multi-purpose gymnasium for youth basketball, volleyball,

and personal performance training in what Webb describes in its Motion as a

105,722 square-foot building that Hoops leases from Webb.[4]  The facility is located

on Lots 1 and 2 (Block B Sunflower Commerce Park Addition), with an address of

5260 N. Tolar Drive in Bel Aire, Kansas.

Hoops was founded in 2013 and is currently owned by Evan McCorry (33%)

and Carlos Perez, Sr. (67%). McCorry is the managing member. Perez, who lives in

San Antonio, initially purchased the "land" for his capital contribution to Hoops.[5]

Hoops then initially owned Lots 1 and 2. Perez individually retained Lot 3, a vacant

lot, except for the north one-third of the lot that is now a parking lot adjacent to Lot

2.[6] Legacy Bank financed about $4 million for Hoops' initial construction of the

facility. The City of Bel Aire issued Industrial Revenue Bonds (IRBs) in 2014 and

---

[1] Doc. 48.

[2] Doc. 97.

[3] Webb Industrial, LLC appears by its attorney Nicholas Grillot. Wichita Hoops, LLC appears by its attorney David Prelle Eron.

[4] Doc. 48, p. 2, ¶ 3. The Lease Agreement refers to the building as the "Warehouse Building." Ex. 1, § 2. Premises.

[5] Ex. 18 at 9, lines 17-20.

[6] Hoops never owned Lot 3 and when it leased back Lot 1 and 2 from Legacy, Lot 3 was not included in the Legacy lease.

2

Sedgwick County granted Hoops a 10-year property tax abatement. Phase II of the project doubled the number of basketball courts in the gymnasium from six to twelve.

In 2020, when Hoops fell behind in payments to Legacy, it deeded the property (Lots 1 and 2) back to Legacy in lieu of foreclosure; Legacy then leased the property back to Hoops until late summer of 2021 when Webb purchased the property from Legacy and entered into the lease that is the subject of this Motion. Perez sold Lot 3 to Legacy Bank prior to Hoops' deed in lieu. Webb purchased not only Lots 1 and 2, but also Lot 3 that Perez had sold to Legacy.

Webb's ownership includes Steve Barrett and a member or members of Crossland Construction. Ivan Crossland, Jr signed the lease as managing member of Webb. Crossland's Realty Group manages the property. Mattie Crossland is the Director of Real Estate for Crossland and oversees lease enforcement. Most of the communications and negotiations regarding the lease occurred between McCorry for Hoops and Barrett for Webb.[7]  Webb (or Crossland's legal department) drafted the lease that is at issue.

*The Lease, Exhibit 1*

Webb and Hoops entered into a two-year triple-net lease agreement on September 24, 2021 (the Lease).[8] Highly summarized, Hoops is obligated to pay monthly Base Rent of $26,000 (during the second year of the Lease) and certain

---

[7] Mr. Barrett did not appear or testify at the evidentiary hearing.
[8] Ex. 1, § 1.1 and § 3.1.

3

estimated Operating Expenses (real estate taxes, insurance, and common area maintenance) as Additional Rent under the Lease. At the end of each calendar year, the estimated Operating Expenses are reconciled to actual expenses, with Hoops either receiving a credit (if estimated exceeded actual) or an additional charge (if estimated was less than actual). With respect to real estate taxes, Webb was responsible for payment of all real property taxes attributable to the Property with reimbursement by Hoops as Additional Rent.[9] The Lease granted Hoops renewal options to extend the current term of the Lease two times, each for a 2-year period.[10] Exercise of the renewal options are conditioned on Hoops being "not then in default" of the Lease and requires Hoops to provide Webb at least ninety-days' written notice prior to the end of the current term of the Lease of Hoops' election to exercise the renewal option.[11]

The nonpayment of rent (after a 10-day grace period) is defined as an event of default under the terms of the Lease.[12] But nothing in the terms of the Lease indicates that a default operates as an automatic termination of the Lease.

### Lot 3 Dispute and Real Estate Taxes

At best, the property that is the subject of the Lease is ambiguous. It is undisputed that the gymnasium is located on Lots 1 and 2 and Hoops concedes that the Lease covers Lot 1 and 2 and the facility. The parties disagree whether Lot 3 is

---

[9] *Id.* at § 14 and § 4.2(a).
[10] *Id.* at § 5.1.
[11] *Id.*
[12] *Id.* at § 18.1(a) (default after 10-day grace period).

included in the leased premises. As noted previously, Perez individually owned Lot 3 and sold it to Legacy Bank before Hoops executed a deed in lieu of foreclosure on Lots 1 and 2. Hoops never owned Lot 3 and never leased Lot 3 back from Legacy Bank. Apparently, when Legacy sold Lots 1 and 2 to Webb, it also sold Lot 3 to Webb. Nowhere in the Lease is there a reference to Lot 3, or Lots 1 and 2, when describing the leased premises, nor is there a legal description of the property clearly delineating the leased premises. McCorry testified that he and Barrett had no discussion regarding Lot 3 during negotiations for the Lease.

The Premises is described as

> . . . certain business space described as *warehouse space* and consisting of *approximately 105,722 square feet of total space*, as outlined on Exhibit 1 attached hereto . . . and made a part hereof, *and within* the warehouse building (**"Warehouse Building"**) located on the following described real property (the **"Property"**): 5260 N Toler Dr, Bel Aire, KS 67226.[13]

The Warehouse Building is the gymnasium facility. The referenced Exhibit 1 was not attached to the Lease. Nor was Exhibit 5 attached to the Lease, the aerial photograph depicting the Premises that was admitted into evidence at the hearing. Exhibit 5 shows Lots 1 and 2 circled; it also shows Lots 3 and 4 to the south of Lot 2, but neither is circled.

Moreover, toward the end of § 2.1 of the Lease there is a reference to an "Exhibit A," which purports to depict the Premises. Exhibit A was also not attached to the Lease Agreement. There was no evidence presented at trial that Exhibit 5 is

---

[13] *Id.* at § 2.1. (Emphasis added.)

5

the same document as that referenced as Exhibit A in the Lease. That part of § 2.1 states:

> Notwithstanding anything depicted on Exhibit A to the contrary, *the leased Premises consist only of approximately 105,722 square feet. No property outside the building is included in the leased Premises.* This Lease includes the right among Tenant and other tenants and invitees of the building, the shared use of common space amenities (if any) associated with the building (if applicable).[14]

The tax history records of Lots 1-3 for tax years 2013-2022 lists separate PIN numbers for each lot.[15] Lot 1 is described as "Lot 1 Block B Sunflower Commerce Park Addition" with a PIN ending in 016.[16] Lot 2 is described by street address "5260 N Toler Dr Bel Aire" and PIN ending in 017.[17] Lot 3 is described as "Lot 3 Block B Sunflower Commerce Park Addition" with a PIN ending in 018.[18] There is no property address listed for Lot 3. The tax statements for Lots 1 and 2 show a general tax of $0 for years 2017-2020, suggesting that those years may have been covered by the tax abatement. In contrast, the Lot 3 tax statement shows modest general taxes for the entire period 2013-2022, including years 2017-2020; that suggests that Lot 3 is largely undeveloped and was not included in the original tax abatement that Hoops received.

The record is unclear exactly when the tax abatement began. According to Ms. Crossland, the extended tax abatement procured by Webb was effective as of January 1, 2022. It was undisputed however that only general taxes were abated;

---

[14] *Id.* (Emphasis added).
[15] Exhibit 9.
[16] *Id.* at 000072.
[17] *Id.* at 000071.
[18] *Id.* at 000070.

6

the property owner remained liable for specials taxes. Ms. Crossland testified that when Webb acquired the lots from Legacy it had to reapply to extend Hoops' tax abatement to Webb; that process occurred over several months in the fall of 2021. Hoops believed the large general tax listed on Lot 2 as the 5260 N Toler Dr property for years 2016 ($25,103) and 2021 ($200,053) were for the two bond fees to obtain the tax abatements.[19]

Based on the above evidence and the language of the Lease, the Court concludes that the leased Premises consists of the gymnasium situated on Lots 1 and 2 only and has total square footage of about 105,722; Lot 3 is not included in the leased Premises.

*Notice of Default, Exhibit 3*

Hoops defaulted on payments under the Lease, both the Base Rent and Operating Expenses. According to Webb's Director of Real Estate, Mattie Crossland, Hoops has not been current on the Lease since October of 2022. On February 24, 2023, Crossland sent a written notice of default letter dated February 24, 2023 (Notice of Default), drafted by Crossland's legal department, to Hoops' managing member Evan McCorry via e-mail and regular mail and made demand on Hoops to cure the default "*within not less than five (5) days from the date of this notice.*"[20] An itemized billing statement of the default in the amount of $98,500.48 as of February

---

[19] Ex. 10 (March 3, 2023 e-mail from McCorry regarding the Default Notice); Ex. 9 at 000071 indicates that those amounts were paid.
[20] Ex. 3. *See also,* Ex. 10, at 000074 (emailing default notice on Friday, February 24 at 4:24 pm).

7

28, 2023 was attached to the Notice of Default.[21]  The Notice of Default further provided that if Hoops continued to be in default after five days of the notice, Webb advised that it intended to exercise any and all available remedies at law and under the Lease, including evicting Hoops from the Premises.[22]  The Notice of Default made no demand for Hoops to quit or vacate the premises.

The Notice of Default makes no mention or reference to termination of the Lease. If Webb were to exercise its right to terminate the Lease, § 18.2(a) of the Lease permitted Webb to ". . . declare immediately due and payable *the lesser of ten (10) months of Rent at the current rate or balance of all Rent for the remainder of the current term"* plus reasonable costs for re-letting the premises and other costs and damages under the Lease. No such demand was made in the Notice of Default and Webb did not indicate its intent to terminate the Lease.

On February 22, 2023, two days before the Notice of Default was sent, Barrett encouraged McCorry to contact Mattie Crossland as soon as possible to discuss the back rent and plan to catch up, warning that the letter was coming.[23]  McCorry texted Crossland the same day requesting a call on February 23, but Crossland didn't respond to the text.[24] On February 24, McCorry and Crossland spoke by phone at length. According to McCorry in

---

[21] Ex. 2.
[22] Ex. 3.
[23] Ex. 12, at 000077 (text message from Barrett to McCorry on 2/22)
[24] Ex. 12, at 000078 (text message from McCCorry to Barrett on 2/23)

8

that phone call, Crossland stated that she understood Hoops' situation and represented that the Lease had not been terminated. One week later, on March 3, McCorry e-mailed a response regarding the default notice to Crossland and a proposal to resolve the default;[25] that same day, Webb filed the eviction action. Crossland did not reply to McCorry's e-mail and instructed the property management team not to respond to McCorry's e-mail. After not hearing back from Crossland, McCorry texted Crossland on March 10 to follow up on his email.[26] Crossland replied that the default had to be cured before the eviction court date, failing which Webb "will pursue eviction as quickly as possible unless your obligations are met. We are not interested in payment plans, or further negotiations."[27]

At the hearing, Crossland testified that prior to sending the Notice of Default, Webb had concluded that working with McCorry was not going to result in anything viable and that it "planned to terminate the lease and pursue an eviction." On cross-examine, Crossland admitted that no separate written notice of intention to terminate the Lease was provided to Hoops. Crossland believed that the Lease was not terminated because the state court hearing on the eviction was stayed by Hoops' bankruptcy filing. Crossland also claimed at the hearing that the Lease terminated at the end of the cure period,

---

[25] Ex. 10.
[26] Ex. 11, at 000075.
[27] *Id.* at 000076.

9

although on cross-examination it was pointed out that Crossland testified in her deposition that the Lease was not terminated.

*Forcible Detainer Petition, Exhibit 4*

Hoops did not cure the default. Without giving Hoops a notice to quit or leave the leased premises, Webb filed a forcible detainer action against Hoops on March 3, 2023 in Sedgwick County District Court.[28] The petition itself refers to the Notice of Default Webb had issued as a notice of breach of the Lease, alleging that Webb delivered to Hoops "a notice of [Hoops'] breach of the Lease Agreement."[29] It further alleges that Hoops "has failed and refused to terminate [its] tenancy" and "now forcibly holds the premises located at 5260 N. Toler Dr. . . ."[30] Nowhere in the pleading did Webb give written notice of its intent to terminate the Lease. Section 18.2(a) of the Lease provides:

> No re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention is given to Tenant.[31]

Further, the petition alleges that amounts owed by Hoops under the Lease

---

[28] Ex. 4. The petition was filed as a limited action under Chapter 61 of the Kansas Rules of Civil Procedure. Article 28, the Code of Civil Procedure for Limited Actions, specifies the scope and type of lawsuits that may be brought as a limited action. A forcible detainer action as provided in K.S.A. 61-3801 through -3808 is permitted as a limited action. *See* K.S.A. 61-2802(b)(3). Section 61-3801 states that the scope of Article 38 governs suits to evict a person from possession of real property but may include a request for judgment for the amount of rent then due. *See* § 61-3804. K.S.A. 61-3803 (2021 Supp.) requires delivery of a "notice to leave the premises for which possession is sought" _prior_ to filing a lawsuit for eviction.

[29] Ex. 4, ¶ 13.

[30] *Id.* at ¶ 14.

[31] Ex. 1, p. 11.

10

"continue to accrue," indicating that Webb did not believe the Lease had been terminated.[32]   Webb sought to be restored to possession and control of the premises at 5260 N. Toler Drive, together with a judgment for unpaid rent, "which is continually accruing," and other amounts due under the Lease, including interest, its attorney's fees and costs.

On March 27, 2023, the day before the scheduled trial on the forcible detainer petition, Hoops filed its Chapter 11 bankruptcy petition, triggering the bankruptcy automatic stay. On April 4 Webb filed the instant Motion.

*Hoops' Operations*

Hoops' sources of income from operations are comprised of rent from hosting basketball tournaments and events, wi-fi charges, camps and clinics, personal training, league fees, and concessions.[33] From its outset, Hoops experienced cash shortfalls and operating deficits. And then the COVID pandemic struck. To cover those shortfalls over the years, members Perez and McCorry made capital contributions to cover income needs or specific costs.[34]

Perez is a retired 18-year executive district manager for a pharmaceutical company, and in addition to his retirement (pension and 401k) and social security, receives on average about $240,000 per year from oil and gas royalty income.[35] He has very limited involvement in the day-to-day operations of Hoops. Between 2014

---

[32] Ex. 4, ¶ 10.
[33] Ex. 6. *See also* Ex. 13, Schedule of upcoming 2023 events as of date of petition.
[34] Hoops' finance manager Joe Ziska testified that the member contributions were treated as capital contributions, and not loans to Hoops.
[35] Ex. 18, at 11, lines 7-20; at 13, lines 6-19, at 27, lines 3-25.

11

and the date of filing of Hoops' bankruptcy petition, Perez contributed a total of $2,037,854.42.[36] Postpetition, he contributed an additional $6,000 in May of 2023.

McCorry owns and runs an aerospace consulting firm. In addition to his ownership interest and role as managing member of Hoops, McCorry has ownership interests in several restaurants. McCorry contributed a total of $1,034,208.46 to Hoops between 2014 and the date of filing of Hoops' bankruptcy petition. Since then, McCorry contributed an additional $10,000 in April and $4,000 in May. Thus, as of the time of the evidentiary hearing on Webb's Motion, Perez and McCorry had contributed capital between them totaling $3,092,062.[37]

In addition to operating deficits, there was much confusion regarding Hoops' liability for real estate taxes and the billing statements submitted by Webb that Hoops questioned without receiving satisfactory answers. For example, McCorry testified to receiving a tax bill for $77,462.38 on April 30, 2022 after Webb reconciled the real estate taxes for the lease period of September 24, 2021 to

---

[36] Ex. 7.

[37] Exhibit 7 contains several computation errors or the amounts in the member contribution columns are incorrect. Adding the yearly member contribution columns for Perez and McCorry, the 2014 year-end total calculates to $347,158.90, not $498,103.44. Likewise, the 2015 year-end total should be $241,023.16; the 2016 year-end total should be $862,838.27; and the 2021 year-end total should be $4,000. Adding the corrected year-end total column the grand total from the chart is $3,072,062.88, plus the hand-written post-petition contributions by the members in April and May of $20,000 noted on Ex. 7, for a total of $3,092,062.88. The year-end discrepancy in Ex. 7 may be attributable to the capital contributions of former one-third owner Carlos Perez, Jr. whose interest was acquired by his father in 2016. No clear explanation of the year-end column discrepancies was provided at trial, other than 2021 was simply a mathematical error.

12

December 31, 2021.[38] After McCorry protested and questioned the charge, Webb eventually wrote-off $75,213.81 on October 31, 2022 as a "bad debt" that was never explained to McCorry.[39] Based on Barrett's representation to McCorry that Hoops received the same tax abatement that Webb received, Hoops believed it had no tax liability. Hoops apparently did not realize that the tax abatement only covered general taxes, and that specials (for infrastructure) were not abated.

On February 1, 2023, Webb reconciled the 2022 real estate taxes and charged Hoops $21,143.37.[40] How that annual figure was derived is unclear. Based on Exhibit 9, the 2022 specials for Lots 1-3 are $20,867.80.[41] Given this Court's determination that Lot 3 is not included in the Lease, Hoops' tax liability for specials should be limited to Lots 1 and 2, or $12,463.82, assuming the tax abatement was in effect in 2022, remains in effect in 2023, and Hoops receives the benefit of the abatement of general taxes. According to Exhibit 9, Lots 1 and 2 did have general taxes of roughly $9,584 in 2022, suggesting that there was no tax abatement in 2022. The Lease is silent regarding Webb's tax abatement. The evidentiary record is unclear what years the tax abatement was in effect other than Exhibit 9's tax billings showing $0 general tax on Lots 1 and 2 in 2015 and from 2017-2020. Finally, Exhibit 9 reflects that all taxes on Lots 1-3 have been paid.

---

[38] *See* Ex. 2, p. 21, 04/30/22 entry.
[39] *Id.*, p. 23, 10/31/2022 entry.
[40] *Id.*, p. 24, 02/01/2023 entry.
[41] Ex. 9. 2022 Specials Tax on Lot 1 - $5474.33; Lot 2 - $6,989.49; and Lot 3 - $8,403.98.

13

Nor could Hoops understand why it was being billed a monthly estimated maintenance charge. Hoops was paying routine maintenance and repair expenses directly to the vendor or supplier as they were incurred. On occasion, a vendor would contact Webb directly and bill Webb for service (*e.g.* HVAC). After the bankruptcy was filed, Webb supplied to Hoops the backup invoices for those maintenance expenses that Webb had incurred and was attempting to pass on to Hoops. Hoops acknowledged its obligation for such bills after satisfactory supporting documentation was furnished by Webb. In short, these lease issues could have been resolved much sooner had there been better communication between the parties and if the Lease had more clearly defined the leased premises and addressed the tax abatement.

Going forward, Perez and McCorry are committed to making capital contributions to cover the budget, some $90,000 projected from April-August,[42] to ensure that lease payments are made on a timely basis. They also intend to pay their proportionate share to cure the prepetition arrearage.[43] Since the filing of its bankruptcy petition, Hoops has satisfied its obligations under the Lease, save for its disputed liability for taxes on Lot 3. It has paid over $28,000 each month since the bankruptcy filing covering the Base Rent, estimated taxes on Lots 1 and 2, and insurance. According to Webb's controller, Webb's monthly carrying costs on Lots 1-3 for its mortgage payment, insurance, and taxes are approximately $22,000.

---

[42] Ex. 6.
[43] Ex. 2; Ex. 18, at 19, lines 13-25 − 20, lines 1-2; at 25, lines 14 − 26, lines1-10.

14

II.   <u>Analysis</u>

Webb makes three basic arguments in support of its Motion. First, it contends that the Lease expired by its stated term prior to Hoops' commencement of this bankruptcy case, making the stay inapplicable under 11 U.S.C. § 362(b)(10). Second, Webb asserts in the alternative that it terminated the unexpired Lease prepetition by giving Notice of Default and commencing the forcible detainer action, thereby precluding Hoops from assuming the Lease under 11 U.S.C. § 365(c)(3). Third, Webb argues that it lacks adequate protection and is entitled to stay relief for cause under § 362(d)(1). The Court addresses each argument seriatim.

**A.**   ***The Lease was not Terminated Prepetition by Expiration of the Stated Term of the Lease***

Under § 362(b)(10), a lease that expires by its stated term prior to commencement of the bankruptcy is excluded from the automatic stay.[44] That statute provides that the filing of a voluntary bankruptcy petition does not operate as a stay—

> . . . of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated *by the expiration of the stated term of the lease before the commencement of* . . . a case under this title *to obtain possession* of such property;[45]

The Lease's stated term "ends at 11:59 p.m. on September 23, 2023, *unless sooner terminated as herein provided."* [46] Hoops commenced this Chapter 11 case on March 27, 2023, and the Lease had not expired by its stated term prior to the bankruptcy

---

[44] A nonresidential lease of real property that has expired prior to the date of petition is not property of the bankruptcy estate. *See* § 541(b)(2).

[45] 11 U.S.C. § 362(b)(10) (Emphasis added).

[46] Ex. 1, § 3.1 (Emphasis added).

15

filing.  Thus, any act by Webb to obtain possession of the leased property, including continuation of its prepetition state court forcible detainer action, is stayed.

### B.  *Webb did not Terminate the Unexpired Lease Prepetition to Prevent Hoops from Assuming the Lease*

Section 365(c)(3) prohibits the debtor's assumption of an *unexpired* lease of nonresidential real property that has been *terminated* under applicable nonbankruptcy law *prior to the order for relief.*[47]  Webb alternatively argues that if the Lease did not expire by its stated term prior to Hoops' bankruptcy filing, Webb terminated the Lease prior to Hoops' bankruptcy filing.  Webb's argument appears to be premised on the contention that the Notice of Default, Hoops' failure to cure the payment default, and Webb's commencement of the forcible detainer action effected a termination of the Lease under Kansas law. The Court disagrees.

First, the forcible detainer action is itself defective. Webb never delivered a notice to quit or leave the leased premises prior to filing the forcible detainer action. The Notice of Default with a demand for payment is not the same as a notice to quit or leave the premises. Under Kansas law, failure to comply with the notice requirements for a forcible detainer is fatal to maintenance of the action. The Kansas case law provides that a forcible detainer action is "purely statutory and a party desiring to avail himself of the remedy must bring himself clearly within the provisions of the law in order to vest the court with jurisdiction."[48] Under the

---

[47] 11 U.S.C. § 365(c)(3) (Emphasis added.).
[48] *Gunter v. Eiznhamer,* 165 Kan. 510, 514, 196 P.2d 177 (1948) (Chapter 61 three-days' notice was condition precent to the right to bring action to recover possession

16

forcible detainer statute, KAN. STAT. ANN. § 61-3803 required delivery of notice *to leave the premises* at least three days before commencing the forcible detainer action.[49] Here, Webb failed to give Hoops any notice to leave or quit the premises before filing the forcible detainer action.[50]

Even if Webb had given proper notice to leave the premises, a forcible detainer action is strictly possessory;[51] it does not operate to terminate the lease.[52] The forcible detainer statutes contemplate and permit subsequent lawsuits by either party "for claims not included in [an eviction] judgment."[53] Thus, after a judgment for possession is obtained, the landlord may subsequently pursue claims

---

of premises). *See also Goodin v. King,* 192 Kan. 304, 309, 387 P.2d 206 (1963) (citing case law and concluding that lessor's demand for immediate possession of the property was insufficient notice to leave the premises); *Bell v. Dennis,* 158 Kan. 35, 37, 144 P.2d 938 (1944) (forcible detainer action is a statutory remedy and summary in character).

[49] K.S.A. 61-3803 (2022 Supp.).

[50] *See Douglass v. Anderson,* 32 Kan. 350, 4 P. 257 (1884) (holding "to quit" and "to leave" are synonymous).

[51] *Bollinger v. Dietrich,* 161 Kan. 358, 359, 168 P.2d 87 (1946) (forcible detainer action is solely possessory in character); *McCracken v. Wright,* 159 Kan. 615, 619, 157 P.2d 814 (1945) (forcible detainer action is strictly possessory, distinguishing an action in ejectment); *Riney v. McGuire,* 471 P.3d 36 (Table), 2020 WL 5490993, at *5 (Kan. App. Sept. 11, 2020) ("Forcible detainer is a statutory claim involving the single question of who has a right to immediate possession of the property," citing *McCracken*).

[52] *See Sunset Opportunities B2, LLC v. A&E Adventures LLC (In re A&E Adventures LLC,* No. 21-cv-4432-DPG, Doc. 18 (S.D. Fla. Mar. 30, 2023) (applying Florida law).

[53] *See* K.S.A. § 61-3802. The language of § 61-3803 (2022 Supp.) does not state that the 3-days' notice to leave the premises shall "determine the lease." *See also Goodin v. King,* 192 Kan. 304, 309 (distinguishing notice requirements to terminate a tenancy under landlord and tenant act and notice requirements to commence and maintain a forcible detainer action; notice requirements to terminate a tenancy do not supersede notice requirements for forcible detainer action).

for damages for breach of the lease and may seek to terminate the lease.

Second, KAN. STAT. ANN. § 58-2507, governing notice for terminating a tenancy, subsequently relied upon by Webb as terminating the Hoops' Lease, provides:

> If a tenant for a period of three months or longer neglect[sic] or refuse[sic] to pay rent when due, *ten days' notice in writing to quit shall determine the lease,* unless such rent be paid before the expiration of said ten days.[54]

Thus, a tenancy for a period of three months or longer may be terminated prior to its stated term for nonpayment of rent by giving a 10-day notice in writing to quit.[55] For the same reason that the Notice of Default did not satisfy the notice to leave the premises before filing the forcible detainer statute, it does not satisfy the written notice to quit required for termination of the Lease. Moreover, the Notice of Default is also deficient because it gave at best only five days' notice, not ten days, *to cure* the default.[56] The Notice of Default makes no mention of § 58-2507, does not give 10-days' notice to quit the premises, and therefore did not terminate the Lease for nonpayment of rent prior to Hoops' bankruptcy filing.

Third, Webb did not terminate the Lease pursuant to the terms of the Lease. No language in the Lease provides that a default, or failure to cure a default,

---

[54] K.S.A. § 58-2507 (Emphasis added).
[55] *See Norris v. McKee,* 102 Kan. 63, 65, 169 P. 201 (1917) (because the tenancy was for more than three months, 1-year lease required ten days' notice for termination and notice would not terminate lease if the rent was paid before the expiration of the ten days).
[56] *Douglass v. Anderson,* 32 Kan. 350, 4 P. 257 *(*a notice to quit given under the landlord and tenant act on less than ten-days' notice will not terminate a three-year lease).

18

constitutes an automatic termination of the Lease. Nor does the Lease provide for automatic termination in the event an action for possession of the leased premises is filed or an eviction judgment is obtained. To the contrary, § 18.2(a) of the Lease provides that "[n]o re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, *unless a written notice of such intention is given to Tenant*." The Notice of Default did not give notice of Webb's intention to terminate the Lease. Nor did the Notice of Default or forcible detainer petition invoke Webb's termination of the Lease by Hoops' default and

> declare immediately due and payable the lesser of ten (10) months of Rent at the current rate or balance of all Rent for the remainder of the current term . . . .[57]

In short, Webb *could* have given proper written notice of intent to terminate and sued Hoops for termination of the Lease before the end of its stated term for Hoops' payment default and before the bankruptcy filing, but it took no action consistent with § 18.2(a) of the Lease to do so. Based on the record before it, the Court concludes that Webb did not terminate the Lease in accord with the terms of the Lease prior to Hoops' bankruptcy filing.[58]

      Ms. Crossland's testimony at trial that Webb intended and did terminate the Hoops Lease is belied by the language of the Notice of Default, which she signed, the forcible detainer petition drafted by her company's legal department, Webb's

---

[57] Ex. 1, § 18.2(a).
[58] *See In re CW Mining,* 422 B.R. 746 (10th Cir. BAP 2010) (where notice of default providing for 60-day cure or lease would be cancelled and lease provided that lessor *may* terminate if there was no cure of default, the lease did not automatically terminate).

19

noncompliance with § 58-2507, and her admissions on cross-examination and her contrary deposition testimony. Accordingly, the unexpired Lease was not terminated under applicable nonbankruptcy law prior to Hoops' bankruptcy filing and § 365(c)(3) of the Bankruptcy Code does not preclude Hoops from assuming the unexpired Lease, subject to its compliance with § 365(a), (b)(1), and (d)(4).

### C. *Cause does not Exist for Relief from the Automatic Stay under § 362(d)(1), including Lack of Adequate Protection*

Having concluded that the Lease did not expire prepetition by its stated term under § 362(b)(10) and that Webb has not terminated the unexpired Lease prepetition under applicable nonbankruptcy law pursuant to § 365(c)(3), the Court turns to Webb's remaining claim that the automatic stay should be lifted to permit Webb to prosecute its forcible detainer action. Webb contends that Hoops is unable to assume the Lease because it cannot cure, or provide adequate assurance that it will promptly cure the prepetition rent default under § 365(b)(1)(A), nor can it provide adequate assurance of future performance of the Lease under § 365(b)(1)(C). As support for its argument, Webb points to Hoops' negative cash flow, operating deficits, and historical unprofitability. Those issues are premature and not ripe for determination where Hoops has not yet filed a motion to assume the unexpired Lease and the time for doing so has not yet expired.[59]

Webb further contends that it lacks adequate protection of its interest in the

---

[59] *See* § 365(d)(4)(A) (determining when an unexpired lease of nonresidential real property is deemed rejected) and § 365(a) (assumption of unexpired lease is subject to the court's approval). Under Fed. R. Bankr. P. 6006(a) and 9014(a) assumption of an unexpired lease is made by motion, unless assumption is part of a plan.

20

leased premises. The burden of proof on a motion for relief from the automatic stay for cause, including lack of adequate protection, pursuant to § 362(d)(1) is allocated between the movant Webb, which has the burden of proof on the issue of debtor's equity in the property, or lack thereof, and the nonmovant Hoops, which has the burden of proof on "all other issues."[60] The movant has the initial burden to produce evidence establishing a prima facie case for stay relief before the ultimate burden of proof shifts to debtor on all issues except equity in the property.[61] Thus, Webb has the initial burden of establishing a prima facie case that it lacks adequate protection; the burden then shifts to Hoops to ultimately persuade the Court that Webb is adequately protected.

Lack of adequate protection may be shown by evidence of depreciation or declining value of the lease premises, the threat of a decline in value, failure to maintain the leased premises, or failure to maintain property insurance and pay property taxes.[62] Webb presented no such evidence. The unrebutted evidence presented was that the property was *not* declining in value, but was holding its value. There was no evidence that the property was uninsured or that Hoops was not adequately maintaining the leased premises. Webb has failed to make a prima facie case that it lacks adequate protection and its Motion can be denied on that basis.

In addition, even if Webb had made a prima facia case, the Court concludes

---

[60] 11 U.S.C. § 362(g).
[61] *In re Vita Craft Corp.,* 625 B.R. 491, 502 (Bankr. D. Kan. 2020).
[62] *In re Elmira Litho, Inc.* 174 B.R. 892 (Bankr. S.D.N.Y. 1994)

Hoops has met its burden of proving that Webb is adequately protected. The leased premises are insured. Hoops has complied with § 365(d)(3)(A) and timely performed its postpetition lease obligations, except the disputed taxes on Lot 3, which this Court has now determined is not part of the leased premises. It has paid $28,614 monthly comprised of $26,000 base rent, $776.86 estimated insurance, and $1,837.35 estimated taxes based on 2022 tax figures.[63] That postpetition monthly payment more than covers Webb's carrying costs of $22,000.

Moreover, the unrebutted testimony was that Perez and McCorry continue to be committed to covering operating deficits with capital contributions, if necessary, as they have done since the inception of Hoops. Hoops has budgeted $90,000 for capital contributions for the period April-August of 2023.[64] They are also committed to make the necessary capital contributions to cure the prepetition default. There was no evidence that Perez and McCorry lacked the financial wherewithal to make needed capital contributions. The Court concludes that Webb is adequately protected.

Conclusion

Webb's motion for a determination that the Lease terminated prepetition by expiration of its stated term is DENIED; 11 U.S.C. § 362(b)(10) is inapplicable. Nor did Webb terminate the unexpired Lease prepetition pursuant to nonbankruptcy

---

[63] Based on Exhibit 9, Hoops' monthly payment for taxes is 1/12th of the total taxes on Lots 1 and 2 and includes both specials and general taxes. Lot 1 total taxes of $5,527.82 + Lot 2 total taxes of $16,520.37 = $22,048.19 ÷ 12 = $1,837.35.
[64] Hoops plan of reorganization is set for confirmation hearing in August.

22

law. Finally, Webb's motion for relief from the automatic stay for cause, including

lack of adequate protection, under 11 U.S.C. § 362(d)(1) is also DENIED.

# # #
